## THOMPSON SCENIO RY. CO. v. CHESTNUT HILL CASINO CO.

(Circuit Court, E. D. Pennsylvania. December 16, 1902.)

No. 30.

1. PATENTS—ANTICIPATION—PLEASURE RAILWAYS.
   The Thompson patent, No. 367,252, claim 5, for an elevated gravity and cable road, in combination with a car provided with an automatic grip, is void for anticipation.

2. SAME—INVENTION.
   The Hinkle patent, No. 307,942, claim 1, for "a gravity tramway having a convoluted return curved track, crossing itself, substantially as described, for the purpose set forth," which is to economize space by making the track go twice around, instead of once, is void for lack of patentable invention; also *held* not infringed, even if valid.

In Equity.  Suit for infringement of letters patent No. 307,942, for a gravity pleasure road, granted November 11, 1884, to Philip Hinkle, and No. 367,252, for an elevated gravity and cable railroad, granted to L. A. Thompson July 26, 1887.  On final hearing.

George J. Harding, for complainants.
Joseph C. Fraley, for defendants.

ARCHBALD, District Judge.*  The so-called Scenic Railway, constructed and operated by the defendants at Chestnut Hill Park, Philadelphia, violates, as it is claimed, two several patents held by the complainant company, one issued to Philip Hinkle, November 11, 1884, for a gravity pleasure road; and the other issued to L. A. Thompson, July 26, 1887, for an elevated gravity and cable road. The structure of which complaint is made consists of an elevated, undulating, part gravity and part cable, railway, covering an area about 600 feet long, and 25 feet wide in its central part, enlarged at one end to 35 feet, and at the other to about 70 feet.  It is arranged in four tracks, two going and two returning in parallel lines, with loops at either end, the tracks of which are also parallel, except that, in order to make the whole a continuous or endless rail, the outer return track crosses the inner one overhead at the beginning of one of the loops, and becomes the inner outgoing track; the track so crossed veering to the outside, and becoming the outer outgoing one. This is illustrated in the following diagram:

In one of the loops is an entrance pavilion, and at the other, a covered structure or tunnel; and, the road being designed for diversion and pleasure, a person desiring to enjoy it embarks on the cars at the pavilion, and is carried twice over the whole course, making a ride of about half a mile.  In its elevation the road is made up of

* Specially assigned.

a number of sharply descending and ascending planes, the cars being carried down the one by gravity, and up the other by a cable; being caught by the latter as they pass from one to the other before their momentum has ceased, by means of an automatic grip, from which they are released in turn at the top of the next incline, where the force of gravity again engages them. In this way the cars are carried forward over the road, up one incline and down another, in a continuous course, imparting pleasure from their rapid and undulating motion. It is contended on the part of the plaintiffs that the defendants' structure infringes on the Hinkle patent, because the tracks are curved and convoluted, and that it adopts and infringes the Thompson patent, by reason of its being a part gravity and part cable railway, with a gripping device that acts automatically. The defendants deny the infringement, and attack the validity of the patents relied upon, and these are the questions to be disposed of.

All the claims of the Thompson Company have been withdrawn, except the fifth, which is for:

"An elevated gravity and cable railway in combination with a car, provided with a gripping device operating automatically, a cable and motive power arranged substantially as described, to elevate simultaneously cars traveling in opposite directions, substantially as and for the purposes set forth."

There can be no doubt that the defendant's railway comes within the terms of this claim. As both the exhibits and the description show, it is a combined gravity and cable railway; the cars which run upon it being equipped with a gripping device which operates automatically, and the motive power being so arranged as to elevate them simultaneously as they move back and forth in opposite directions from one end of the line to the other. It is of no moment that two cables are employed instead of one, or that the gripping device differs in some particulars from that described in the patent. It is the combination which is patented, and this, if valid, covers these variations, as equivalents. The infringement being clearly made out, this part of the case turns, therefore, on the validity of the patent.

The combination of ascending planes and descending inclines, over the one of which cars are elevated by means of a cable, and over the other are propelled by the force of gravity, is not new in general railroad engineering, or in this special branch of it. Over 50 years ago the Pennsylvania Coal Company constructed a coal-carrying road on this exact principle from its mines at Pittston, Pa., to Hawley, on the line of the Delaware & Hudson Canal, a distance of some 45 miles. This road was in successful operation for about 35 years, until supplanted some 17 years ago by a more pretentious locomotive railway. Even before this, the Delaware & Hudson Canal Company, which was engaged in the mining of anthracite coal in the Northern coal basin, had a similar road about 7 miles long from its coal mines at Archbald to Carbondale, and in 1858 extended the system some 16 miles further, over the Moosic Mountain, to Honesdale. This road was also in active operation until within 4 or 5 years. The well-known switch-back railway at Mauch

Chunk, Pa., affords another example. This, like the others mentioned, was originally a coal road extending some 9 miles to Summit Hill and return, but is now entirely given up to pleasure, and is still in operation. In each of these instances the railway was made up of sharply ascending planes, up which the cars were drawn by means of cables, alternating with slightly descending grades, called "levels," down which they were allowed to run by gravity, the location of the planes and levels being controlled by the physical conformation of the country traversed; and in each case there was a return track, made up in the same way, by which the cars were brought back to the starting point. These are matters of local history in the anthracite coal regions, so prominent and so well known to me by personal acquaintance and observation that I feel justified in referring to them in this way.

But to keep strictly to the record, there are several of the defendants' references which clearly disclose the elements under discussion. Thus the Graulhie British patent (1823), both in the specifications and drawings, shows an undulatory track composed of alternating ascending planes and descending inclines; the cars being drawn up the one by cables, and proceeding to the foot of the next plane on a descending grade by force of gravity; the device patented, of which this is a part, being claimed by the inventor to be applicable not only for the "conveyance of persons and goods over water and ravines for military or other objects," but also for "purposes of recreation and exercise." The Hinkle patent (1884), in suit, and the Lake British patent (1885), are also constructed on the same principle; the latter being, as it is to be noted, for improvements "in endless railways designed for recreation or amusement." Each of these establishes that a part gravity and part cable railway, with alternating ascending and descending grades, whether designed for business or pleasure, was not new at the time of the Thompson patent. As to these elements, therefore, the patent is without novelty; and the only question is how far it is saved by the combination with an automatic grip, which is also a part of the claim.

The designed effect of automatically engaging and releasing the car as it advances along the track is to produce a continuous, pleasurable motion, up and over the several undulations of the course from one end to the other, without stopping, and this is the combined result of the form of the track, the motive power employed, and the method of engaging it. It is therefore a true combination, and involving, as I think it does, the exercise of inventive skill, was properly patentable, provided it had not already been anticipated or disclosed in the art. But unfortunately for the complainants, it had been. It can be spelled out, as it seems to me, in the Graulhie (1823), already referred to; and it specifically and clearly appears in the Lake, of 1885. As we have already seen, this is for a combined gravity and cable road; and an automatic grip, working in combination the same way as in the Thompson, is also an essential feature. This is shown by the seventh claim, which is for:

"A circular railway track, having a general down grade, which operates the vehicle by gravity, and a uniform up grade, provided with a cable trac-

tion for the vehicle, both grades being so arranged in relation to each other that the momentum of the vehicle will carry it partly on to the up grade, and an automatically operating cable grip on the vehicle, all combined substantially as described."

Turning to the specifications, we find that the grip is to be "so arranged that a vehicle running up the incline * * * will automatically gripe the cable and be drawn up the incline by its help, and then be automatically released again when the top of the incline is reached." The same combination is to be found in the Hinkle (1884), in suit. The operation of the gravity pleasure road, which is there patented, is thus described:

"From this [starting] point an incline * * * reaches the highest * * * point of the track, and along the said incline * * * the cars are drawn by an endless cable * * * mounted on sheaves. * * * At certain points on the endless cable are loose ends or lengths * * *, the ends of which are provided with toggles or other desired fastening devices to engage * * * with the car or cars and draw them up the incline; and, as soon as the cars pass the highest point and pass onto the incline, * * * they run forward of the cable and release themselves from the fastening device, passing on around the track."

Nothing more is needed to show the entire anticipation by others of all that is covered by the Thompson patent. If any particular kind of gripping device was specified, it might, to that extent, perhaps, be saved; but, as it depends on the general combination of the elements brought together, it is of no novelty, and affords no ground for the present complaint.

The alleged infringement of the Hinkle patent remains to be considered. The first claim, which is the one relied upon, defines the patent as "a gravity tramway having a convoluted return curved track, crossing itself substantially as described, for the purpose set forth." The preceding specifications embrace considerably more than this, as we have just seen; but the patentee is, of course, confined to what he claims. The infringement asserted consists in the alleged curved and convoluted character of the defendants' tracks as they return upon each other at either end of the line. The object of the construction patented is declared, among other things, to be "to increase the distance of possible travel of the cars within the necessarily circumscribed space in which such structures are built"; and the invention is said to consist "of a continuous convoluted track, passing through two or more ellipses in traversing the space within which the track is contained." This is no more than saying that, in order to economize space and have a longer track, the railway is made to go twice around, instead of only once; one track at the end crossing the other at grade, or going over or under it. Surely this cannot be said to involve inventive genius. It is what any one of ordinary mechanical ability could do if the problem were presented, and is altogether too obvious to be patented. Without stopping to consider any references, I am persuaded that the patent is, to this extent, void, for want of invention.

But even if mistaken in this view, I am satisfied that the defendants have not infringed. Taking the description as it is given in the claim, it is not at all clear what is meant by a "convoluted return curved track crossing itself," and, standing alone, it is a question how far it

would be good. But the added words, "substantially as described for the purpose set forth," carry us back to the specifications; and we find there, as already stated, that this part of the invention consists of "a continuous convoluted track, passing through two or more ellipses." The inventor thus commits himself to an elliptical form of track, and the accompanying drawings and descriptions show that the ellipses are intended to approach very nearly to a circle, and to be closely concentric. The purpose of this is to permit of a central revolving observation platform or pavilion, which is an independent but important feature of the general invention. It cannot, therefore, be extended to embrace other forms of tracks, even though they double upon themselves so as to be in some respects curved and convoluted. In the defendant's railway, as already indicated, we have what might be called an elongated dumb-bell or golf stick. For 500 feet the tracks run in a straight line, parallel with each other, and just far enough apart to pass to and fro conveniently, the whole space occupied being about 24 feet wide; and while at the two ends they curve around together so as to return on themselves, and may, to that extent, be said to be curved and convoluted, yet, taken as a whole, they certainly do not have that form, nor any that is described or covered by the patent. Both on the ground, therefore, of the noninfringement of the Hinkle patent, as well as the invalidity of it, this part of the plaintiffs' case cannot be sustained, any more than the other.

Let a decree be drawn dismissing the bill, with costs.